DISTRICT COURT OF APPEAL OF FLORIDA
SECOND DISTRICT

_____

GEICO GENERAL INSURANCE COMPANY,

Appellant/Cross-Appellee,

v.

SUPERIOR AUTO GLASS OF TAMPA BAY, INC. as Assignee of MATTHEW DICK,

Appellee/Cross-Appellant.

No. 2D21-2833
_____

January 17, 2024

Appeal from the County Court for Hillsborough County; Joelle Ann Ober, Judge.

Lindsey R. Trowell, Ariane J. Smith, and Chloe A. Orta of Smith, Gambrell & Russell, LLP, Jacksonville, for Appellant/Cross-Appellee.

Raymond T. Elligett, Jr., and Amy S. Farrior of Buell & Elliget, P.A., Tampa; David M. Caldevilla of de la Parte & Gilbert, P.A., Tampa; Anthony T. Prieto of Morgan & Morgan, P.A., Tampa; and Christopher P. Calkin and Mike N. Koulianos of The Law Offices of Christopher P. Calkin, P.A., Tampa, for Appellee/Cross-Appellant.

ATKINSON, Judge.

GEICO General Insurance Company appeals the final judgment—entered notwithstanding a jury verdict in favor of GEICO—awarding Superior Auto Glass of Tampa Bay, Inc., $438.72 as damages for GEICO breaching the insurance contract between GEICO and its customer,

Matthew Dick, who assigned his benefits to Superior. The trial court concluded that GEICO presented no evidence from which a jury could find GEICO proved its defenses of waiver and that it paid the prevailing competitive price for the windshield replacement, which undisputedly was a covered loss under the policy. Superior cross-appeals requesting that we reinstate either of the two county court final summary judgments reversed by the circuit court in prior appeals[1] or that we remand for a new trial.

On the main appeal, we reject GEICO's arguments regarding its waiver defense and its Florida Motor Vehicle Repair Act claim without further comment. But because it cannot be said that no view of the evidence, or inferences made therefrom, could support a verdict for GEICO on its defense that it paid Superior the prevailing competitive price for the windshield replacement, we conclude that the trial court erred by granting Superior's motion for judgment in accordance with its previous motion for directed verdict. On the cross-appeal, we reject Superior's request to reinstate either of the prior final summary judgments, as that would amount to a second appeal. We do not reach the merits of Superior's request for a new trial because the trial court reasoned that the motion was moot and therefore never ruled on the merits of the motion. Therefore, we reverse the trial court's final judgment in favor of Superior and remand for the trial court to enter

---

[1] Prior to January 1, 2021, circuit courts had jurisdiction over appeals from county court orders and judgments. *See Davis v. Clark*, 326 So. 3d 781, 782 n.1 (Fla. 2d DCA 2021) ("[T]he legislature amended section 26.012(1), Florida Statutes (2020), to eliminate circuit court jurisdiction over appeals of county court orders and judgments, effective January 1, 2021." (citing ch. 20-61 § 3, Laws of Fla.)).

judgment in favor of GEICO in accordance with the jury's verdict and to rule on the merits of Superior's motion for new trial.

## Background

On February 17, 2015, Superior replaced the windshield on Mr. Dick's 2010 Ford Escape. Superior sent GEICO, Mr. Dick's insurer, an $818.60 invoice for the windshield replacement pursuant to an assignment of insurance benefits that Mr. Dick signed. Included in this amount was the cost of the windshield glass at $442.05, labor of 2.6 hours at $85.00 per hour, and two fast-cure urethane kits at $51.00 each, in addition to tax of $53.55.

Linda Rollinson, the owner of Superior, explained at trial that she charges customers based on the recommendations issued by the National Auto Glass Specifications (NAGS), which is updated several times throughout the year. She testified that NAGS is the industry standard, relied upon by repair facilities as well as insurance companies. Rollinson, who serves on several national windshield-related boards and committees, provided the following testimony:

> NAGS will provide every windshield that will fit that specific year, make, and model. It will provide what is needed for a windshield replacement. It will provide the standard labor hours to replace that windshield. And it will tell you whether you need one or two, or one and a half, two and a half kits of urethane.

NAGS does not suggest an hourly labor rate, just the number of hours to complete the replacement. Rollinson sets Superior's prices at 100% of the NAGS suggested rates.

GEICO also utilizes NAGS in setting pricing parameters for the approximately 100,000 to 150,000 windshield claims it processes each year in Florida. GEICO's corporate representative, Susan Eberling, testified that

3

for windshield replacement[,] it is 50 percent off the NAGS list price[,] it is $40 per hour for labor and the number of labor hours is assigned by NAGS[,] and the kits are generally $15 per kit for your standard kit and those are the usual components that are necessarily for windshield replacement.

GEICO paid Superior $379.88 in accordance with those parameters.

Both Superior and GEICO contend that their price constituted the "prevailing competitive price," which, under the insurance policy with Mr. Dick, is the limit of liability for the loss:

The limit of our liability for **loss**:

1.  Is the **actual cash value** of the property at the time of the **loss**;

2.  Will not exceed the prevailing competitive price to repair or replace the property at the time of **loss**, or any of its parts, including parts from non-original equipment manufacturers, with other of like kind and quality and will not include compensation for any diminution of value that is claimed to result from the **loss**.  Although **you** have the right to choose any repair facility or location, the limit of liability for repair or replacement of such property is the prevailing competitive price which is the price we can secure from a competent and conveniently located repair facility.  At **your** request, we will identify a repair facility that will perform the repairs or replacement at the prevailing competitive price.

(Emphasis in original.).  GEICO admitted that a covered loss occurred. The sole dispute at trial was the amount GEICO was required to pay Superior for the windshield replacement under the terms of the policy.

Among other things, GEICO asserted as affirmative defenses (1) that it "paid in full the prevailing competitive price for the repair at issue and [Superior's] invoice exceeds the prevailing competitive price" and (2) that Superior "intentionally relinquished any right to an amount in excess of the amount paid."  The county court twice granted final

4

summary judgment in favor of Superior, concluding that Superior's price did not exceed the prevailing competitive price. The circuit court, sitting in its appellate capacity, reversed each of the judgments.

In the first reversal, the circuit court concluded that the "prevailing competitive price" was a question of fact and held that the test for that determination "is what the service would cost in a competitive market in a normal, arms' length non-insurance transaction." *Gov't Emps. Ins. Co. v. Superior Auto Glass of Tampa Bay, Inc.* (*Dick I*), 26 Fla. L. Weekly Supp. 876a (Fla. 13th Cir. Ct. Mar. 27, 2018). In the second reversal, the circuit court concluded that Superior's evidence did not meet its summary judgment burden to establish the prevailing competitive price under the test set forth in *Dick I* and, therefore, that genuine issues of material fact remained. *Gov't Emps. Ins. Co. v. Superior Auto Glass of Tampa Bay, Inc.* (*Dick II*), 28 Fla. L. Weekly Supp. 785a (Fla. 13th Cir. Ct. Oct. 2, 2020). In response to what Superior labeled a "protective cross appeal" that asked the circuit court "to determine which party bears the burden of proof," the circuit court in *Dick II* also concluded, "Where GEICO effectively admitted coverage while relying on its policy language as a defense to further liability, . . . GEICO, not Superior, will have the burden to show that GEICO's payment is consistent with the policy's prevailing competitive price." *Id.*

In its opening statement at trial, GEICO acknowledged *Dick II*'s holding as to the burden of proof. GEICO called Ms. Eberling, who testified that GEICO was "very much aware of the claims we're receiving and the amounts that we're paying, so we're aware that we can secure a price that does not exceed 50 percent of the NAGS price." Ms. Eberling said that GEICO has its finger on the pulse of the market given the high volume of windshield claims that it processes each year. She explained

5

that GEICO transacts business with "hundreds of shops" in a given year for windshield claims, some of which are network, affiliate shops and others are nonnetwork, nonaffiliate shops. Network, affiliate shops are members of an insurance network that GEICO selects for windshield claims and who bill GEICO at or below its pricing parameters. Nonnetwork, nonaffiliate shops, on the other hand, are selected by GEICO's policyholders, are not members of any insurance network, and have no contractual relationship with GEICO.[2] When asked whether there are more nonaffiliate shops that bill GEICO at its pricing parameters than do not, Ms. Eberling responded, "Yes."

With respect to the competency of the nonaffiliate repair shops selected by the insureds, Ms. Eberling explained that

> generally after their claim, there are surveys that we do. . . . [W]e do surveys with our customers to determine if there's any issues and so forth so they can report issues with any shop and certainly the policy holders generally do not hesitate to contact us to let us know if they're unhappy with a given shop.

She was asked whether "GEICO [would] hear from their insured if they were unhappy with the service they received," and she answered affirmatively. When asked whether "there [is] any other way that GEICO can identify whether there is a shop that doesn't perform competent work, an independent shop, in their claims information," she replied, "We might see an instance if there was perhaps multiple replacements on the same claim." She was asked, "And based on your testimony about the information GEICO would have about these shops of choice, do you have any reason to believe that the independent shops that transacted

---

[2] Throughout the record, the parties interchangeably refer to these shops as "nonnetwork" shops, "nonaffiliate" shops, or "independent" shops, all three of which appear throughout this opinion.

6

business with GEICO in or around this claim were not competent?" She replied, "No."

During cross-examination, Ms. Eberling reiterated GEICO's payment parameters: "50 percent off the NAGS list price for the windshield, $40 per hour for labor, and the kits are $15 per kit, and there's a . . . 20 percent discount on the molding." These parameters constitute "our limit of liability, so that's the ceiling of what we pay." And she confirmed that when an insured selects a nonaffiliate shop, GEICO pays the majority of the claims to nonaffiliate shops at these parameters. She was unaware of the factors that led to the parameters but testified, "Certainly, in 2015, I know that we could secure an amount that does not exceed 50 percent off the NAGS windshield list price."

To further show that GEICO could secure a price at its parameters, GEICO attempted to introduce a claims history spreadsheet into evidence that contained various data points for its windshield claims in 2015. The spreadsheet was limited to claims involving nonnetwork repair shops and showed, among other things, the amount billed by the shop and the amount paid by GEICO. GEICO explained: "We're going to present evidence of what GEICO pursuant to our policy secures in the market . . . . [T]he standard here is GEICO transacts business at its parameters with hundreds of shops and that's what [the spreadsheet] shows." GEICO expounded that the spreadsheet showed transactions in which nonnetwork repair shops "sent GEICO a bill at GEICO's prevailing competitive price and GEICO paid at that prevailing competitive price." In using the term "prevailing competitive price," GEICO clarified that Ms. Eberling would testify the amounts billed and paid as shown on the spreadsheet were in accordance with GEICO's pricing parameters.

7

Without allowing a proffer and based solely on argument of counsel, the trial court excluded the spreadsheet from evidence.

> Well, see, I just -- I don't feel comfortable with this. I feel it is too misleading, too confusing, and [the jury is] not going to know what to do with this, even based on testimony, that you're not provided with it. I just don't think they're going to know what to do with this, and I just don't see it being relevant, I really don't. So that's my ruling . . . .

The trial court reserved ruling on the admissibility of testimony about the information in the spreadsheet.

Later, GEICO requested reconsideration and proffered testimony from Ms. Eberling to establish that the spreadsheet is GEICO's business record. The trial court agreed that Ms. Eberling authenticated the document and that it was GEICO's business record but reiterated its prior ruling, explaining that "the information is so monumentally misleading and confusing to the jury[,] . . . [and] that outweighs its probative value. . . . [I]t's not relevant because . . . the confusion and the misleading outweighs the probative value."

GEICO then called Dr. Jim McClave, an econometrician who applies statistical analyses to economic issues. Superior objected to the admissibility of his testimony because it was based upon a review and analysis of GEICO's claims data that the trial court had excluded from evidence. GEICO proffered his testimony, following which the trial court allowed him to testify.

Dr. McClave "concluded that GEICO's payments for windshield replacements according to the data[] are fully consistent with prevailing competitive prices." He utilized GEICO's claims history data, focusing on the 115 nonaffiliate shops located in the Tampa Bay area that did business with GEICO in 2015. He limited his analysis to these nonaffiliate, "independent" shops because they "had no affiliation or

8

relationship with GEICO" and, as such, "no obligation to take the work." He analyzed 6,500 transactions with those limitations, comparing the amounts the shops invoiced with the amounts GEICO paid. If the figures matched within 5%, he concluded that GEICO was able to secure a price at its parameters based on his understanding that GEICO typically pays according to those parameters.[3] In other words, if the amount billed by the shop and paid by GEICO matched, he opined that "there is strong reason to believe that they were both using the same formula." According to his calculations, 55% of the independent shops in the Tampa Bay area had their invoices paid in full 90% of the time. Superior, in contrast, "consistently invoiced at significantly higher amounts than what they got paid." Dr. McClave concluded:

> [I]n my opinion, GEICO is indeed able to secure work at conveniently located locations independent shops that don't have to take the work at prevailing competitive prices[,] or we wouldn't see, in my opinion, we wouldn't see thousands of transactions taking place right at the GEICO price. It wouldn't make rational sense. If shops are losing money or anticipating losing money if they take GEICO work, they have a choice. They don't have to take GEICO work. And yet, thousands of times they are taking the work, invoicing, understanding exactly what they're going to get paid, and to me that is strong economic evidence that GEICO is indeed paying at a prevailing competitive price.
>
> . . . .
>
> . . . [I]f a shop doesn't have to take the work and looks at that invoice and says, "I can't do it for that price," they could turn it down. But if the shop says I'll replace the windshield knowing that that is what I'm going to get paid and actually invoices at that [price], then to me that is an arm's-length

---

[3] Dr. McClave included transactions in his calculations in which the invoiced and paid amounts matched within 5% because he understood there were variables that could explain those small differences, such as discounts for early payments or electronic payments.

transaction. Willing buyer, willing seller that neither of which had to do the work or pay for the work.

At the close of GEICO's case-in-chief, both Superior and GEICO moved for a directed verdict. The trial court denied both motions, providing, in pertinent part, the following explanation:

> I feel like all these things that you're arguing to the [c]ourt regarding the evidence presented in the trial can certainly be argued to the jury. I believe both sides have presented sufficient evidence to let the trier of fact decide their position on the case and certainly narrow down the issues for them as best we could and all that is happened in the case. But I feel all motions for directed verdict should be denied and the jury as the trier of fact should decide this matter.

The jury returned a verdict for GEICO on its defenses of payment of the prevailing competitive price and waiver.

Superior filed a posttrial "Motion to Set Aside Verdict and for Judgment in Accordance with Motion for Directed Verdict, or for New Trial." The court granted the motion in part, concluding that GEICO presented no admissible evidence upon which the jury could rely to find that GEICO paid Superior the prevailing competitive price. The court cited two reasons: (1) there was no evidence that the amounts paid by GEICO in the pricing data utilized by its expert statistician were based on an open, competitive market because they were based entirely upon GEICO's claims and use of GEICO's pricing formula and (2) there was no evidence that GEICO's pricing data was based on "competent" repair facilities. The court set aside the jury verdict and entered judgment in favor of Superior for $438.72, representing the difference between what Superior billed and GEICO paid. Given its decision to enter judgment in Superior's favor, the court noted that Superior's motion for new trial was rendered moot.

## Analysis

GEICO contends that the trial court erred by entering judgment in Superior's favor in accordance with its motion for directed verdict, an issue we review de novo. *See Martinez v. Lobster Haven, LLC*, 320 So. 3d 873, 880 (Fla. 2d DCA 2021) ("We review de novo the trial court's decision to grant the motion for judgment in accordance with the motion for a directed verdict."). "[T]he rules governing a posttrial motion for judgment in accordance with a previous motion for directed verdict are the same as a motion for directed verdict at the close of the evidence . . . ." *Cooper Hotel Servs., Inc. v. MacFarland*, 662 So. 2d 710, 712 (Fla. 2d DCA 1995) (quoting *Greene v. Flewelling*, 366 So. 2d 777, 779 (Fla. 2d DCA 1978)). The motion "should be resolved with extreme caution," *id.*, and "should be granted only where no view of the evidence, or inferences made therefrom, could support a verdict for the nonmoving party," *United Servs. Auto. Ass'n v. Rey*, 313 So. 3d 698, 702 (Fla. 2d DCA 2020) (quoting *Sims v. Cristinzio*, 898 So. 2d 1004, 1005 (Fla. 2d DCA 2005)). "[T]he court must evaluate the testimony in the light most favorable to the nonmoving party and every reasonable inference deduced from the evidence must be indulged in favor of the nonmoving party." *Id.* (quoting *Sims*, 898 So. 2d at 1005).

## I.

The framework against which the evidence must be evaluated bears discussion. GEICO's defense was that it paid Superior the "prevailing competitive price," which, under the policy, "is the price [GEICO] can secure from a competent and conveniently located repair facility." The circuit court held in *Dick I* that the prevailing competitive price is "what the service would cost in a competitive market in a normal, arms' length

non-insurance transaction" and then held in *Dick II* that GEICO bore the burden of proof.

The circuit court's opinions in *Dick I* and *Dick II* are the law of the case. *See City Nat'l Bank of Fla. v. City of Tampa,* 67 So. 3d 293, 299 (Fla. 2d DCA 2011) ("We agree with the Third District that a decision by a circuit court, sitting in its appellate capacity, becomes the law of the case on issues which were necessarily presented and decided in the prior action."). We are constrained by the law of the case unless a " 'manifest injustice' will result from a strict and rigid adherence to the rule." *Tiede v. Satterfield,* 870 So. 2d 225, 228 (Fla. 2d DCA 2004) (quoting *Strazzulla v. Hendrick,* 177 So. 2d 1, 4 (Fla. 1965)); *see also United Auto. Ins. Co. v. Comprehensive Health Ctr.,* 173 So. 3d 1061, 1065 (Fla. 3d DCA 2015) ("[A] question of law decided on appeal will seldom be reconsidered or reversed, even when it appears to have been erroneous."). As neither party has argued that such an injustice will result here, we are obligated to adhere to the framework set forth in *Dick I* and *Dick II.*

What also bears discussion is the trial court's construction and application of the policy language and the framework articulated in *Dick I* and *Dick II.* In setting aside the verdict, the trial court reasoned that there was no evidence that the amounts GEICO paid in its various transactions were "rooted in a competitive market" because the evidence "was based entirely on GEICO claims" and "the GEICO formula." The corollary to the trial court's rationale is that GEICO needed to present evidence of non-GEICO claims without use of the GEICO formula to establish the prevailing competitive price. That cannot be the case. According to the plain language of the policy, the prevailing competitive price is the price that *GEICO* can secure. Therefore, evidence of the prevailing competitive price inherently *must* be based upon GEICO's

12

claims. Even the circuit court in *Dick II* recognized that evidence of what other insurers paid could not necessarily establish the prevailing competitive price. *See Dick II*, 28 Fla. L. Weekly Supp. 785a ("Evidence that invoices were paid in full by other insurers can only be relevant if the policy language of those insurers is the same as GEICO's policy."). Given the policy language and the affirmation of it by *Dick I* and *Dick II*, the only logical way to interpret the use of the phrase "normal, arms' length non-insurance transaction" in those opinions is that it was meant to exclude consideration of those transactions involving prices "set in an agreement between GEICO and a particular provider." *Dick I*, 26 Fla. L. Weekly Supp. 876a; *Dick II*, 28 Fla. L. Weekly Supp. 785a.

The trial court's rationale created a standard that is inconsistent with the language of the policy and absent from the circuit court appellate opinions that control this case. That rationale, and Superior's defense of it on appeal, constitute an unjustified extension of the holdings of *Dick I* and *Dick II*. In those opinions, the circuit court affirmed the policy language that allowed GEICO to limit its obligation to prices that it alone could negotiate, agreeing that the prevailing competitive price is "the price [GEICO] can secure from a competent and conveniently located repair facility." *Dick I*, 26 Fla. L. Weekly Supp. 876a; *Dick II*, 28 Fla. L. Weekly Supp. 785a. What the circuit court opined that GEICO could *not* do was "say 'prevailing competitive price' is the limit of its liability and then effectively limit its exposure to a lower price it alone could obtain through a non-open-market transaction." *Id.* The distinction the circuit court was drawing was not between those prices GEICO alone could obtain and those that could be obtained by other insurance carriers or windshield purchasers. Rather, the distinction was between those prices that GEICO "alone could obtain

13

through . . . non-open-market transaction[s]" and those that GEICO alone could obtain through *open* market transactions—which the trial court characterized as what the service would cost "in a competitive market in a normal, arms' length non-insurance transaction." *Dick I*, 26 Fla. L. Weekly Supp. 876a (rejecting GEICO's interpretation in the trial court that the prevailing competitive price is "*any* price it elects to pay that can get the repair done" (emphasis added)). Thus, while Superior and the trial court would have us believe that we are required by *Dick I* and *Dick II* to ignore any transactions in which GEICO negotiated prices by imposition of its formula, that requirement imports an elevated standard unsupported by those decisions' analysis of the "prevailing competitive price."

In other words, the circuit court's reasoning in *Dick I* and *Dick II* makes it evident that not all of GEICO's claims are to be excluded from consideration in determining the prevailing competitive price, only those that conform to those opinions' conception of non-open-market transactions—transactions with prices that GEICO obtained through agreements negotiated with its network providers. It follows that while GEICO cannot rely on any such "non-open-market transaction[s]" as evidence to limit its exposure to a lower price under the policy's "prevailing competitive price" limitation, it *can* rely on those transactions meeting the criteria of *open*-market to limit its exposure—even if the prices secured might be those that only GEICO could obtain. The trial court's conclusion that there was no evidence of open-market, competitive transactions simply because GEICO limited its evidence to that of its own claims based on its own pricing parameters was therefore incorrect. In resolving Superior's motion, the trial court was required to evaluate whether, consistent with *Dick I* and *Dick II*, there was evidence

14

from which the jury could have determined that GEICO secured prices in open-market, competitive transactions from competent and conveniently located facilities.

## II.

GEICO contends there was evidence from which the jury could conclude that GEICO paid Superior the prevailing competitive price. GEICO presented testimony from Ms. Eberling that based on her twenty-one-year career with GEICO that included involvement and experience with thousands of the high volume of claims GEICO processes each year—over 100,000—she knew GEICO could secure a price for a windshield replacement in 2015 at its pricing parameters: 50% of the NAGS suggested rate, $40 per hour for labor, and $15 per kit. She testified that GEICO transacts business with hundreds of shops in a given year and more shops bill at or below GEICO's parameters than do not. GEICO therefore sought to establish the prevailing competitive price by reference to the pricing for each component of a windshield replacement, which can vary based upon the type of vehicle, the number of labor hours required, and the time of year as the NAGS suggested rates are updated. Ms. Eberling's testimony did just that. It provided an evidentiary basis from which the jury could conclude that GEICO could secure a price at its parameters in 2015 more often than not—the same parameters within which GEICO paid Superior.

Ms. Eberling's testimony also provided a basis from which the jury could conclude that the prices GEICO secured at its parameters in 2015 were in an open, competitive market, within the meaning of that phrase according to *Dick I* and *Dick II*, involving "normal, arm's length non-insurance transaction[s]." She specified that GEICO secured those prices from nonnetwork repair shops, which are chosen by GEICO's

15

policyholders and have no affiliation or contract with GEICO. Ms. Eberling explained that the nonnetwork shops chose to take work on GEICO claims without any obligation to do so and, more often than not, chose to bill and accept payment at GEICO's pricing parameters. Contrary to the flawed formulation of Superior and the trial court, just because nonnetwork repair shops bill and accept payment at GEICO's parameters does not make those transactions "non-open-market" or noncompetitive. In fact, the competitive nature of the market is further illustrated by the fact that sometimes GEICO secures pricing from nonnetwork shops at its parameters, and sometimes it does not.[4] What Ms. Eberling's testimony provided was evidence from which it could be inferred that GEICO could secure a price at its parameters in 2015 and could do so in a preponderance of the transactions, allowing the jury to conclude that this pricing was not only possible but "prevailing." *See, e.g., Prevailing*, The American Heritage Dictionary (5th ed. 2011) (defining

---

[4] If not for *Dick I* and *Dick II*, GEICO would not need to confine its evidence to nonnetwork repair shops or otherwise because even that requirement finds no basis in the ordinary meaning of the policy language. The prevailing competitive price is what the policy language says it is, "the price [GEICO] can secure from a competent and conveniently located repair facility," and there is no exception in the event GEICO can routinely secure lower prices through a network of repair shops or other agreement. *See State Farm Mut. Auto. Ins. Co. v. Menendez*, 70 So. 3d 566, 569 (Fla. 2011) ("In interpreting an insurance contract, we are bound by the plain meaning of the contract's text."). Nothing in the policy indicates that GEICO's use of effective negotiating strategies to secure lower prices—relying, for instance, on volume as a potential means of achieving some degree of market hegemony—renders those prices noncompetitive. In other words, competing successfully to reduce costs does not—as the circuit court appellate opinions suggest— remove the resulting lower-cost transactions from the realm of "a competitive market." *See Dick I*, 26 Fla. L. Weekly Supp. 876a. But even under the *Dick I* and *Dick II* strictures, which this court is bound to follow as the law of the case, GEICO met its evidentiary burden.

"prevailing" as "[g]enerally current; widespread"); *see also Prevailing*, Oxford English Dictionary Online (2023), https://www.oed.com/ (defining "prevailing" as "[p]redominant in extent or amount; most widely occurring or accepted").

While Ms. Eberling's testimony was sufficient to support the verdict as to the prevailing competitive price, GEICO also adduced testimony from Dr. McClave to buttress its case. Dr. McClave performed a statistical analysis of GEICO's claims data, searching for instances where the amount billed to GEICO matched the amount GEICO paid. He found that, through approximately 6,500 transactions, 55% of 115 nonnetwork, independent shops in the Tampa Bay area who did business with GEICO in 2015 had their invoices paid in full 90% of the time. Dr. McClave concluded that the transactions in which the amounts billed and GEICO's payments matched were reflective of GEICO's ability to secure a price in competitive and arm's length transactions, otherwise he would not see thousands of transactions taking place with shops that have no obligation to take the work. This evidence satisfies the meaning ascribed to the term "competitive" by the circuit court in *Dick I*. Thus, even presuming for the sake of analysis that Dr. McClave's testimony—relying as it did on Ms. Eberling's assurance that the preponderance of claims were paid within GEICO's parameters—provided no support that any particular transaction itself constituted the prevailing competitive price, his testimony was relevant to GEICO's theory that the transactions on which it based its case were of the competitive and open-market type that satisfied the test set forth in *Dick I* and *Dick II*.

Superior argues that Dr. McClave's testimony was inadmissible because it was premised upon the claims history spreadsheet that the trial court excluded from evidence. By allowing Dr. McClave to testify as

17

he did, it would appear as if the trial court implicitly overruled itself, at least in part. More importantly, any possible error in admitting Dr. McClave's testimony due to its basis in the excluded spreadsheet is inconsequential given this court's determination, explained more fully below, that the exclusion itself was erroneous.

GEICO correctly argues that the trial court erred in excluding the claims history spreadsheet from evidence. *See Sottilaro v. Figueroa*, 86 So. 3d 505, 507 (Fla. 2d DCA 2012) (providing that "a trial court's ruling on the admissibility of evidence is subject to an abuse of discretion standard of review," except that an erroneous interpretation of the evidence code and applicable case law is reviewed de novo). The trial court excluded the spreadsheet on the basis that it would confuse or mislead the jury and, in doing so, reasoned that "it's not relevant because . . . the confusion and the misleading outweighs the probative value." We note that the trial court improperly conflated relevance with the balancing test set forth in section 90.403, Florida Statutes (2021). Balancing the spreadsheet's probative value with the danger it might confuse or mislead the jury is only necessary if it is, in fact, relevant. *Compare* § 90.401, Fla. Stat. (2021) ("Relevant evidence is evidence tending to prove or disprove a material fact."), *with* § 90.403 ("*Relevant* evidence is inadmissible if its probative value is substantially outweighed by the danger of . . . confusion of issues [or] misleading the jury . . . ." (emphasis added)). The trial court's conclusion that the evidence was *not* relevant *because* its prejudicial effect outweighed its probative value is contrary to both law and logic: if the evidence has probative value against which to weigh potential prejudice, then it is manifestly relevant. The trial court's rationale for excluding the spreadsheet as not relevant was therefore based on an erroneous interpretation of the evidence code.

18

Moreover, the trial court abused its discretion in excluding the spreadsheet on the basis that it would confuse or mislead the jury. It offered no explanation why or how the spreadsheet would do so other than to say the jury was "not going to know what to do with this." Notwithstanding, it cannot reasonably be said that the probative value of a document listing the prices GEICO secured from its 2015 windshield claim transactions with nonnetwork repair shops—in a case in which the core issue is determining what price GEICO could secure for a windshield replacement—is "*substantially* outweighed" by the danger of misleading or confusing the jury. *See* § 90.403 (emphasis added). And we reject Superior's arguments under the Tipsy Coachman doctrine that the spreadsheet was inadmissible for other reasons.

The trial court's evidentiary error aside, the claims spreadsheet itself, on this record, does little if anything to support the verdict. While Ms. Eberling explained that GEICO pays the majority of its windshield replacement claims at its pricing parameters, she also explained other unique circumstances that may at times lead GEICO to pay a different price. There is nothing on the face of the spreadsheet that denotes whether the amount GEICO paid in each transaction was according to its pricing parameters or was a different price based on some unique circumstance. We realize that GEICO may have presented additional testimony had the trial court not excluded the spreadsheet prior to its case-in-chief. In fact, GEICO argued to the trial court that Ms. Eberling would testify that the spreadsheet reflects transactions in which independent shops bill, and GEICO pays, according to GEICO's parameters. However, because the testimony Ms. Eberling did provide supports the verdict, the possibility that the information in the excluded spreadsheet—and the expert testimony based thereon—might have

19

added nothing of any probative value over and above that provided by Ms. Eberling is of no consequence.

Finally, the trial court also concluded that GEICO's evidence could not support the verdict because there was no evidence that GEICO secured pricing from "competent" repair facilities. Ms. Eberling testified that she had no reason to believe the nonnetwork repair shops were not competent. She explained that, after each claim, GEICO transmits a customer satisfaction survey to its insureds, and GEICO would hear from its insureds if they were unhappy with the services received pursuant to those surveys. She also explained that GEICO might see multiple windshield replacements being performed on the same claim if a shop did not perform competent work. When reviewing an order granting a motion for directed verdict in accordance with a previous motion for directed verdict, we must indulge every reasonable inference from the evidence in favor of GEICO. *See United Servs. Auto. Ass'n*, 313 So. 3d at 702. In doing so, there is evidence supporting the verdict because it can be reasonably inferred that the lack of dissatisfactory responses from the surveys and lack of multiple replacements on the same claim indicated that the nonnetwork repair shops GEICO did business with were competent. When determining whether to deprive the jury of its province by directing a verdict, it is not the prerogative of this court or the trial court to consider whether or how a litigant could have better supported its defense at trial. Even if another view of the evidence is equally compelling or more so, the question is whether "*no* view of the evidence, *or inferences made therefrom*, could support a verdict for the nonmoving party." *See id.* (emphasis added) (quoting *Sims*, 898 So. 2d at 1005). Assessing the evidence in the light most favorable to GEICO and considering all reasonable inferences in its favor, *see Sims*, 898 So. 2d at

20

1005, it cannot be said that there is no view of the evidence that could support a verdict that the entities from which GEICO was able to secure a price within the parameters it paid Superior were "competent" repair facilities.

In sum, although a different jury may have come to a different conclusion, there was admissible evidence presented upon which the jury could reasonably conclude that GEICO established it paid Superior the prevailing competitive price. Because viewing the evidence and all reasonable inferences in favor of GEICO could support the jury's verdict, the trial court erred in granting Superior's motion for judgment in accordance with prior motion for directed verdict and entering final judgment in favor of Superior.

### III.

In its cross-appeal, which Superior conditions upon the court reversing the judgment notwithstanding the verdict, Superior first requests that we reinstate either of the county court's prior final summary judgments in its favor. We cannot do this. Both of the county court's final summary judgments were previously appealed to the circuit court, and the circuit court reversed them both. The circuit court's decisions now constitute the law of the case and, as described above, receding from them would not be justified absent a manifest injustice. *City Nat'l Bank of Fla.*, 67 So. 3d at 299; *Tiede*, 870 So. 2d at 228. Reinstating either of the county court's final summary judgments would therefore violate the law of the case doctrine and impermissibly afford the parties a second plenary appeal.

Superior alternatively requests that we remand for a new trial based upon the admission of inadmissible evidence, an erroneous jury instruction on the prevailing competitive price, and because the verdict

21

was against the manifest weight of the evidence. However, when the trial court granted Superior's motion for judgment in accordance with its motion for directed verdict, it did not rule on the merits of Superior's alternative motion for new trial. Instead, the trial court reasoned that "[t]he alternative portion of the motion for new trial is rendered moot." Therefore, given our decision to reverse on GEICO's main appeal, the trial court shall rule on the merits of Superior's motion for new trial on remand. *Cf. Thor Bear, Inc. v. Crocker Mizner Park, Inc.*, 648 So. 2d 168, 173 (Fla. 4th DCA 1994 ("[W]here the trial court has ruled upon a motion for judgment in accordance with prior motions for directed verdict, but not upon the motion for new trial, the appropriate procedure upon reversal is to instruct the trial court on remand to rule upon the motion for new trial."); *Kilburn v. Davenport*, 286 So. 2d 241, 244 (Fla. 3d DCA 1973).

## Conclusion

Based on the foregoing, we reverse the trial court's final judgment entered notwithstanding the jury verdict. We remand for entry of a judgment in favor of GEICO in accordance with the jury's verdict and for the trial court to rule on the merits of Superior's motion for new trial.

Reversed and remanded with instructions.


KHOUZAM, J., Concurs in result only.
CASANUEVA, J., Concurs with opinion.

CASANUEVA, Judge, Concurring.

And the last shall be first. I concur with the conclusion reached in the majority opinion that the trial court erred by entering a final judgment notwithstanding the jury verdict and that this cause should be remanded to the trial court to enter a final judgment in favor of GEICO that comports with the jury verdict. Likewise, I also concur that on remand, the trial court should rule on the merits of Superior's motion for a new trial.

Because the issue presented by this case is one likely to generate additional litigation in the future, I hasten to add that as to the primary opinion, I additionally concur with sections I and III of the analysis.

However, as to section II of the analysis, I do not concur in the second, third, or seventh paragraph; nor do I join in the content of footnote four.

_____

Opinion subject to revision prior to official publication.